# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MICHAEL PARKER**, <br><br>     Plaintiff, <br><br>     *v.* <br><br> **BUTTONWOOD PAINTING CONTRACTORS, INC.,** <br><br>     Defendant. | **CIVIL ACTION** <br><br> **NO. 19-724-KSM** |

## MEMORANDUM

**MARSTON, J.**                                                    **June 8, 2020**

This is an employment discrimination case brought by Plaintiff Michael Parker against Defendant Buttonwood Company, Inc.[1] In his Complaint, Parker alleges claims of race discrimination/disparate treatment, hostile work environment, and unlawful termination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* ("the "PHRA").  Presently before the Court is Buttonwood's Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56.  For the reasons discussed below, we will grant Buttonwood's Motion in part and deny it in part.

## I.     *Factual Background*

Taking the facts in the light most favorable to Plaintiff, the relevant facts are as follows.

---

[1] Defendant is listed as Buttonwood Painting Contractors, Inc. on the case caption and in the pleadings. *See, e.g.*, Compl. (Doc. No. 1); Def.'s Mot. for Summ. J. (Doc. No. 10).  However, Defendant notes in its Statement of Undisputed Material Facts—and Plaintiff does not dispute—that its proper name is Buttonwood Company, Inc.  *See* Def.'s Statement of Undisputed Material Facts ¶ 2 (Doc. No. 10-3); Pl.'s Resp. ¶ 2 (Doc. No. 12-3).

Parker started working for the Union, District Council 21, as an apprentice in 2006, and in 2010 or 2011, he graduated to a licensed journeyman painter.[2]  Buttonwood only hired Union painters,[3] and around late-2014, Parker began working on-and-off as a seasonal painter for Buttonwood.[4]

At Buttonwood, while on a job site, Parker reported to the foreman of that site, who was responsible for overseeing the painters and directing their work.[5]  Around August 2017, Parker was assigned to work at Buttonwood's Hanover job site with foreman David Gordon.[6]  Parker remained at the Hanover site for approximately four to six weeks, until September 28, 2017.[7]

At first, Parker thought that Gordon liked him because he was willing to work on weekends and was "a good worker."[8]  About a week or two after they started working together, however, Parker sensed a shift in his relationship with Gordon.[9]  Around this time, Gordon approached Parker and asked whether he spoke Spanish.[10]  Parker replied that he did not.[11]  A few days later, Gordon approached Parker and another employee.[12]  Gordon asked the other employee if he spoke

---

[2] Def.'s Mot. for Summ. J., Ex. E, Parker Tr. 11:3–12:18 ("Parker Tr.").

[3] *Id.* at 72:17–22.

[4] *Id.* at 20:4–21:3

[5] *Id.* at 64:7–17; Def.'s Mot. for Summ. J., Ex. F, Gordon Dep. 9:14–10:10 ("Gordon Dep.").

[6] Parker Tr. 66:2–18.

[7] *Id.* at 80:12–16, 135:14–23.  Out of the approximately twenty to thirty Buttonwood employees who worked at the Hanover site, Parker was one of two African Americans.  *Id.* at 71:14–72:16.

[8] *Id.* at 67:2–14, 75:3–12.

[9] *Id.* at 67:15–68:16, 69:11–70:5, 74:5–75:25.

[10] *Id.* at 67:15–68:16, 69:11–70:5.

[11] *Id.* at 67:15–68:16.

[12] *Id.* at 67:15–68:16, 76:1–78:23.

Spanish, and once that worker replied that he did not, Gordon again asked Parker whether Parker spoke Spanish.[13]  Again, Parker told Gordon that he did not.[14]  Gordon then pressed, "Well, what are you?"[15]  Parker asked why it mattered, to which Gordon responded, "I'm just asking, Parker."[16]  Eventually, Parker told Gordon, "I'm mixed.  I'm black and white."[17]  Gordon responded, "[W]hy didn't you just say that?  If you're black, it's nothing to be ashamed of.  You should wear that on your sleeve like a badge of honor."[18]  Parker "felt that it was none of [Gordon's] business" what race Parker identified with, and Parker was upset that Gordon was "identifying [him] as a black man now."[19]  Parker did not want to discuss race with Gordon and thought, "[D]ude, don't tell me who I am."[20]

Immediately after Gordon learned Parker was biracial, Parker felt that Gordon's behavior towards him changed.[21]  Parker testified that it was like a switch had been flipped, and Gordon's

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*; *accord* Def.'s Mot. for Summ. J., Ex. J at 4 ("Dave turned around and said to me hey man if you're black you need to own it you should wear that on your sleeve like a badge of honor."); Def.'s Mot. for Summ. J., Ex. D, Pl.'s Resp. to Interr. No. 3 ("Mr. Gordon told Parker, 'if you're black, you're black, wear it as a badge of honor.'").

[19] Parker Tr. 68:17–22, 70:17–71:3.

[20] *Id.*

[21] *Id.* at 74:5–75:25; *see also* Def.'s Mot. for Summ. J., Ex. J at 4 ("Let me bring you back to where it all began . . . what nationality are you I said I'm Irish and black from that day forward he began to treat me differently.").

treatment of him went "from one extreme to the other."[22]   In particular, Parker observed that Gordon "went from being nice to [him]" and asking if he wanted to work on the weekends to earn overtime, to "not asking [him] no more," "becoming very agitated," and "screaming in [his] face and spitting in [his] face."[23]

Parker also testified that Gordon's approach was at first "very subtle" after he learned that Parker was biracial, as if Gordon was trying to determine how Parker identified—black or white.[24] For example, Parker testified that during his second or third week on the job site, Gordon brought up a boxing match between two athletes who were different races (Conor McGregor and Floyd Mayweather), and asked "who's the better fighter and things like that."[25]   Parker felt that Gordon was trying to get him to pick a side to "see how [he] identif[ied]" and testified that Gordon "was always bringing up a black and white thing out of nowhere."[26]   During a different incident, Gordon raised the issue of race again when he told Parker that he talked "like a white guy" and stated that another employee acted "more black than [Parker]."[27]   Parker testified that Gordon's discussions on race grew more frequent, leading him to feel pressure to pick a side, which made him uncomfortable.[28]

---

[22] Parker Tr. 74:5−75:22.

[23] *Id.*

[24] *Id.* at 78:24−81:3.

[25] *Id.* at 79:8−81:9.

[26] *Id.*

[27] *Id.* at 95:17−96:10.

[28] *Id.* at 82:2−83:21.  Although Parker felt that "[i]t was just always something" "[d]ay in and day out," he also testified that "it wasn't like an every day all day harassment torture.  It was a pot shot here and there." *Id.* at 96:5−10.

Parker was also bothered after his black co-worker Roneesha Williams' demeanor towards him changed following a walk with Gordon.[29] After her walk, Williams told Parker, "[D]ude, one day you talk like you're black.  One day you talk like you're white.  I don't fuck with frauds."[30] Parker acknowledged that he "can't say for sure it came from [Gordon]," though his "gut feeling" was that "[Gordon] was attacking [him]" to Williams.[31]

On another occasion, while Gordon told a joke, Gordon singled out Parker and asked him, "[W]hat's the best thing man ever made for a black woman?"[32]  Parker replied, "I don't know, Dave . . . [W]hat[?]"[33]  Gordon responded, "a wig."[34]  In response to this offensive joke, Parker asked Gordon if he had "ever been with a black woman."[35]  Gordon replied, "No, Parker.  I'm from the other side of the bridge.  We don't do that.  And I'd be shunned from my community if I was ever with a black woman."[36]

In addition, Parker felt that Gordon bullied him.[37]  Once, Gordon borrowed Parker's phone,

---

[29] *Id.* at 92:1–93:24, 94:13–95:6, 115:19–117:9; *see also* Def.'s Mot. for Summ. J., Ex. J at 4 ("He caused racial tension between me and another African-American woman who works for your company he has the young woman telling me to stick to my own kind and I'm not black enough that one minute I talk like a white person the next minute I talk like a black person and she don't mess with frauds[.]").

[30] Parker Tr. 92:1–93:24.

[31] *Id.* at 92:25–93:14.

[32] *Id.* at 89:21–91:20.

[33] *Id.*

[34] *Id.*; *see also* Def.'s Mot. for Summ. J., Ex. J at 4; Def.'s Mot. for Summ. J, Ex. D, Pl.'s Resp. to Interr. No. 3.  Parker pinpointed this incident as the one prompting him to feel targeted by Gordon's comments. Parker Tr. 120:3–121:15, 140:8–13.

[35] *Id.* at 89:21–90:20, 120:3–121:15.

[36] *Id.*; *accord* Def.'s Mot. for Summ. J, Ex. D, Pl.'s Resp. to Interr. No. 3 ("Mr. Gordon, said 'no Parker. I'm from 9th street, I would be disowned if I dated a black woman.'").

[37] Parker Tr. 97:12–20, 98:13–99:12, 139:1–23.  Parker testified, "Well, there was a time that – not

flipped through Parker's photos, and showed the crew pictures of Parker's wife, commenting, "[h]ow did he get a girl like that."[38]   During another incident, Parker recalled that he had been cutting in (*i.e.*, doing brush work around the perimeter of the surface) on three rooms, and Gordon yelled at him for not moving fast enough.[39]   Parker also testified that Gordon would stand right behind him while he was working, startling him, and at times, Parker observed Gordon staring at him in what he perceived to be disgust.[40]

Parker also pointed to an incident that occurred on September 27, 2017, when Gordon directed Parker and an apprentice to paint a parking garage area and provided them with tools.[41] In Parker's opinion, Gordon had not given them enough tools to properly complete the assigned work.[42]   Parker asked Gordon for more supplies, but Gordon refused to give any additional tools.[43] Later, Parker sent the apprentice to get a 9-inch roller with a 9-inch sleeve.[44]   The apprentice informed Parker that when he went to retrieve the tools, Gordon yelled at him and "snatched" the

---

reflecting to race.  But like when I made my complaint to Jennifer I told her that I felt like he was being a bully and racist at the same time."  *Id.* at 97:12–20.  *Accord* Def.'s Mot. for Summ. J., Ex. J at 3–5 (first discussing Gordon's bullying, then noting that "[b]esides his physical act of violence and verbal abuse Dave Gordon Is a racist" and describing Gordon's discriminatory remarks and conduct).  Parker admits that Gordon did not make any racial comments during the September 28, 2017 incident, which he had categorized as bullying.  Parker Tr. 139:12–23.

[38] *Id.* at 97:21–98:12.

[39] *Id.* at 111:8–112:15.  Parker also observed Gordon yell at others on the job site and described Gordon as "a yeller."  *Id.* at 113:11–24.  Although Parker "yelled at [other] guys" and "pushed" others, Parker felt like Gordon was yelling at him "for a different reason."  *Id.*

[40] *Id.* at 134:23–136:25.

[41] *Id.* at 104:14–107:14.

[42] *Id.*

[43] *Id.* at 107:15–109:25.

[44] *Id.* at 106:12–109:25.

roller out of his hand and threw it across the room.[45]   At a break, Gordon approached Parker and was "visibly upset" that Parker had undermined his authority by instructing the apprentice to retrieve the roller.[46]

For Parker, tensions reached a boiling point the next day on September 28, 2017, around 7:00 a.m.[47]  Parker had been assigned to perform cut in work with a brush, and another co-worker had been assigned to roll.[48]   After observing Parker from behind, Gordon began cursing and "screaming at the top of his lungs" at Parker for cutting in (brushing) a spot that his co-worker was supposed to roll over instead.[49]   Parker recalled that he may have been assigned to "cut all low," when Gordon observed him "standing up cutting something that was high" rather than "on [his] knees cutting low"; in other words, Gordon was upset Parker was not doing as he was instructed.[50] When Parker tried to explain, Gordon told him, "I really don't care about your logic if you don't do things the way that I tell you to do them you're gone you're out of here."[51]  As Gordon's spit

---

[45] *Id.*; Def.'s Mot. for Summ. J., Ex. J at 3.

[46] Parker Tr. 108:16−110:16.

[47] *Id*. at 145:6−146:11.

[48] *Id.* at 124:11−130:7.

[49] *Id.* at 124:11−130:7, 139:1−14.  According to Parker, Gordon screamed, "What the hell are you doing? The roller's going to get that," "Belcher is rolling, Belcher's rolling  That's not your area.  Don't touch it. We're rolling everything tight," and "What are you, stupid?  I didn't tell you to do that."  *Id.* at 125:4−129:3, 139:1−11.

[50] *Id.* at 130:3−14, 133:19−134:5.  *See also id.* at 131:4−15 ("It was more so you're not doing what I told you to do, so now you're going to hear it.").

[51] Def.'s Mot. for Summ. J., Ex. J at 3.  According to Parker, on an earlier occasion, Gordon thought Parker was priming walls and told Parker, "I swear on my children if you prime any thing ever again you're gone."  *Id.* at 3-4.

began flying in his face, Parker stepped back to create some distance.[52]  Nonetheless, Gordon took

a step forward towards him, and started screaming louder, such that spit was still spraying out of

Gordon's mouth towards Parker.[53]  Following this encounter with Gordon, Parker felt "humiliated"

and "[tears] were there," such that one of his co-workers, Steven Belcher, approached him to see

if he was alright and put an arm around him to comfort him.[54]

About two hours later, around 9:00 a.m., Parker walked off the Hanover site because "[he]

felt that [he] had no other alternative" as he felt "threatened" by Gordon.[55]  Parker testified, "I felt

like I was avoiding a crisis.  I have personal boundaries and Dave crossed them."[56]  Parker

elaborated: "I made the decision to walk out, because I knew at this point if this guy comes in my

face one more time I'm going to end up in trouble.  And I don't want to be the guy in trouble."[57]

Once Parker arrived home, he received a phone call from Gordon, asking where he went.[58]  Parker

told Gordon that he was at home, and after Gordon inquired why he left, Parker responded, "I'm

tired of your stuff, man.  I can't deal with you no more."[59]

Parker had not raised any complaints to Buttonwood prior to walking off the Hanover job

---

[52] Parker Tr. 100:13−103:9, 140:22−141:6.

[53] *Id.* at 100:13−103:9.

[54] *Id.* at 140:13−141:20; *see also* Def.'s Mot. for Summ. J., Ex. J at 3 ("Steven Belcher asked me was I OK[.]").  Another co-worker named George also comforted Parker.  Parker Tr. 145:17−146:11.

[55] *Id.* at 141:20−142:20; Def.'s Mot. for Summ. J., Ex. J at 3.

[56] Parker Tr. 24:2−10.

[57] *Id.* at 145:17−146:11.

[58] *Id.* at 142:21−143:15.

[59] *Id.*

site on September 28.[60]  However, the next morning, on September 29, Parker called Buttonwood's

roadman, Harry Gordon—Gordon's brother—to explain the situation and complain about

Gordon's treatment of him.[61]  Parker informed Harry Gordon that his brother was bullying him

and causing racial tension.[62]  Harry Gordon indicated that he did not want to hear any more and

instructed Parker to escalate the matter above him.[63]  The same day, Parker sent an email to

Buttonwood's owner and explained:

> I was recently an employee of yours up until yesterday.  There was an incident
> where I felt like I had no other alternative but to walk off the hanover job because
> I felt threatened by one of your Formans [sic] Dave Gordon.  Dave is a well-known
> bully I had 2 options stand up to Dave as a bully or walk away yes I chose to walk
> away because I wasn't going to jeopardize my freedom[.][64]

Parker detailed Gordon's bullying behavior and complained of Gordon's discriminatory

conduct.[65]

In response to Parker's complaint, the Union conducted an investigation.[66]  The Union

---

[60] *Id.* at 120:3−24 ("No [I didn't complain about Gordon's comments before], because I didn't feel they
were too serious.  They weren't hurting me as bad as when he spit in − when the spit was flying out of his
mouth, that was a hurt piece."); *see also* Def.'s Mot. for Summ. J., Ex. D, Pl.'s Resp. to Interr. No. 4
(reflecting that Plaintiff first complained about Gordon's conduct when he called Harry Gordon after the
September 28, 2017 incident, and then when he sent an email to Buttonwood's owner).

[61] Parker Tr. 146:12−16, 148:25−147:7; Def.'s Mot. for Summ. J., Ex. J at 3.

[62] Parker Tr. 147:8−151:6.

[63] *Id.*; *accord* Def.'s Mot. for Summ. J., Ex. J at 5.

[64] Def.'s Mot. for Summ. J., Ex. J at 3.  Parker also testified that he asked whether he was eligible to be
rehired, noting "[W]hen I walk off a job, I knew that was my choice.  You know.  So I didn't know, am I
fired?  Did I quit?  I don't know that.  All I know is for my safety, and for Dave's safety, I was removing
myself . . . That was the choice I had to make that day."  Parker Tr. 152:19−153:15.

[65] *See* Def.'s Mot. for Summ. J., Ex. J; *see also id.* at 5 ("Besides his physical act of violence and verbal
abuse Dave Gordon Is a racist."); *id.* at 4−5 (describing how Gordon asked Parker "what is the best thing
ever invented for black woman" and "said a wig," how Gordon asked Parker his nationality, and how
Gordon "caused racial tension" between Parker and Williams).

[66] Def.'s Mot. for Summ. J., Ex. H, Forte Tr. 11:3−20 ("Forte Tr.").

spoke with Williams, Gordon, and the shop steward of the Hanover site, none of whom corroborated Parker's allegations.[67]  Parker did not cooperate with the Union's investigation.[68] The Union reported its findings to Buttonwood's President Jennifer Tiedeken, who spoke to Gordon and ultimately gave Gordon a "formal warning to amend his behavior on the job site."[69]

On November 17, 2017, Parker filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which he requested be dual-filed with the PHRC.[70]  Parker received his Right to Sue Letter from the EEOC on November 23, 2018,[71] and filed suit on February 21, 2019.[72]

## II.    *Standard of Review*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp.*

---

[67] Forte Tr. 12:4–16:8, 16:17–23; Def.'s Mot. for Summ. J., Ex. I, Kresz Tr. 14:5–17:14, 19:3–7, 20:9–22 ("Kresz Tr.").

[68] Forte Dep. 16:9–17:2; Kresz Dep. 19:9–23.

[69] Def.'s Mot. for Summ. J., Ex. G, Tiedeken Tr. 19:5–9 ("Tiedeken Tr."); Def.'s Mot. for Summ. J., Ex. J at 2.

[70] Supp. Ex. A (Doc. No. 17).

[71] Compl., Ex. A (Doc. No. 1).

[72] Compl.

*v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from those facts" are matters left to the jury. *Anderson*, 477 U.S. at 255.

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The non-moving party must show more than the "mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## III.   *Discussion*

Buttonwood claims that Parker has failed to establish a *prima facie* case for his hostile work environment, race discrimination, and retaliation claims.[73] Further, Buttonwood argues that because Parker did not obtain a right to sue letter for his PHRA claims, Parker has failed to exhaust his administrative remedies and these claims must be dismissed.[74] We address each issue in turn.

---

[73] *See* Def.'s Br. (Doc. No. 10-4) at pp. 4–16.

[74] Oral Argument Tr. 4:1–18 (Doc. No. 22).

### A.      Hostile Work Environment Claim[75]

To succeed on a hostile work environment claim, the plaintiff must establish: "(1) the employee suffered intentional discrimination because of [his race]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of *respondeat superior* liability." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013); *see also Scott v. Genesis Healthcare, Inc.*, Civil Action No. 15-0916, 2016 WL 4430650, at *15 (E.D. Pa. Aug. 22, 2016). To determine whether a work environment is hostile, courts consider "the totality of the circumstances," including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interferes with an employee's work performance." *Tolani v. Upper Southampton Tp.*, 158 F. Supp. 2d 593, 596–97 (E.D. Pa. 2001) (internal quotation marks and citation omitted).

---

[75] In a footnote in its opening brief, Buttonwood argues that Parker has not pled a hostile work environment claim but Buttonwood addresses that claim anyway "in an abundance of caution." *See* Def.'s Br. at p. 4 n.2.

As a threshold matter, we note that Parker has exhausted his administrative remedies as to a hostile work environment claim, since he included facts within his charge that gave notice that the alleged constructive discharge arose from ongoing issues. *See* Supp. Ex. A; *Haaijer v. Omnova Sols., Inc.*, Civil No. 3:18-CV-942, 2018 WL 6981178, at *9 (M.D. Pa. Dec. 18, 2018) (noting that "courts eschew reliance upon any particular terms of art to state a hostile workplace claim" and that workers "need not use any particular magic words to state such a claim at the administrative level"); *Lowenstein v. Catholic Health E.,* 820 F. Supp. 2d 639, 645 (E.D. Pa. 2011) (concluding that the plaintiff exhausted her administrative remedies and gave the EEOC proper notice of a hostile work environment claim where the facts in the charge showed her claims "arose from a series of related events that allegedly ended in her termination").

Second, we note that, during oral argument, even Buttonwood conceded that the magic words "hostile work environment" are "not dispositive" of whether a hostile work environment claim has been pled. *See* Oral Argument Tr. 4:1–6:22. We find that although Parker did not use the magic words "hostile work environment," his allegations, taken as a whole, plead a hostile work environment claim. Further, Buttonwood spends approximately six pages of its opening brief addressing a hostile work environment claim, illustrating that it was on notice of such a claim.

### i.    *Intentional Discrimination*

Buttonwood first argues that Parker cannot show discriminatory animus, emphasizing that much of Gordon's behavior, such as "feeling [Parker] out on black versus white topics" and yelling at Parker during the September 28 incident, was objectively neutral.[76]   Under the first element of a hostile work environment claim, a plaintiff must show that the defendant's conduct "was motivated by animus based on . . . race."  *Lucas v. City of Phila.*, Civil Action No. 11-4376, 2013 WL 2156007, at *13 (E.D. Pa. May 17, 2013) (internal quotation marks and citation omitted).  "[T]he proper inquiry at this stage [is ascertaining] whether a reasonable factfinder could view the evidence as showing that [the plaintiff's] treatment was attributable to [his] [race].  Stated differently, the intent to discriminate can be inferred from the entire context and the conduct of the actors involved."  *Id.* (internal quotation marks and citations omitted).  "[T]he Third Circuit has repeatedly held that courts must consider evidence of discrimination in context to determine if otherwise neutral conduct gives rise to an inference of discrimination." *Hite v. Manor Junior Coll.*, 301 F. Supp. 3d 478, 485 (E.D. Pa. 2008) (citations omitted).

In *Scott v. Genesis Healthcare, Inc.*, the plaintiff testified that his supervisor stated that "most of these people — most of these black people in this building only have employment because of Welfare to Work," that the plaintiff "was lucky to have his job . . . because if it were up to [him], [the plaintiff] would be gone . . . because [the plaintiff] didn't know what he was doing," and that he would "push as many papers if [he] would have to, you know, force [the plaintiff] either out of this position, out of the job."  2016 WL 4430650, at *17.  The plaintiff also alleged that the supervisor threatened his employment, slammed doors, and yelled at him. *Id.*  The court held that the plaintiff "demonstrated that a reasonable jury, believing Plaintiff's

---

[76] Oral Argument Tr. 7:4–10:21; Def.'s Br. at pp. 5–10.

recitation of facts—that [his supervisor] made comments concerning African Americans and threats to Plaintiff's job security and there was little basis that Plaintiff was performing poorly—could have found that [the supervisor's] facially neutral conduct was actually employed to harass Plaintiff on the basis of his race." *Id.* The court also noted that, at a minimum, there were genuine disputes of fact over whether the supervisor made those statements and employed such tactics. *Id.* Accordingly, the court denied summary judgment on the hostile work environment claim. *Id.*

In *Lucas v. City of Philadelphia*, the plaintiff testified that his supervisor repeatedly commented that the plaintiff supported President Barack Obama because he was black and that the supervisor "had a derogatory image of [President] Obama on his computer with a bucket of fried chicken and drinking Kool Aid—stereotypes for African Americans." 2013 WL 2156007, at *13. The plaintiff also testified that he became the "surrogate" for the supervisor's hostility towards President Obama because he shared President Obama's race and politics. *Id.* The court noted that "such evidence is weak at best and certainly would not support a summary judgment ruling in Plaintiff's favor" but emphasized that was not the applicable standard in determining whether the plaintiff's claim could survive *the defendant's* summary judgment motion. *Id.* at *14. Viewing the facts in the light most favorable to the plaintiff, the court held that the plaintiff had created a genuine issue of material fact as to whether he suffered intentional discrimination because of his race and concluded that "[w]hen presented with live testimony, a jury could reasonably determine that [the supervisor] did, in fact, harbor some racial animus and treated Plaintiff poorly due to his race." *Id.* at *13–14; *see also Hite*, 301 F. Supp. 3d at 480–81, 485–86 (rejecting the defendant's argument that a jury could not infer that the conduct was based upon the plaintiff's race and finding the plaintiff had created genuine disputes of fact, where the

14

plaintiff contended that a co-worker used the N-word, co-workers frequently played rap music at a loud volume that included the N-word, and her supervisor suggested she was hired based on her race because a person who played a role in her hiring "had a thing for black women"); *Syed v. YWCA of Hanover*, 906 F. Supp. 2d 345, 355–56 (M.D. Pa. 2012) (holding that the plaintiff created a genuine dispute of material fact as to intentional discrimination, where the plaintiff testified that her supervisor "criticized her 'awful' Pakistani-styled dress"; "called her a 'brown bitch' on more than one occasion"; "insinuated that she did not know how to properly open a door due to her origin"; and "told her that she needed to learn to drive because 'we don't ride camel[s] here'").

Here, Parker testified[77] that (1) after Gordon learned his race, it was like a switch had been flipped and Gordon treated him differently, such as growing agitated when talking to Parker and no longer giving him weekend work;[78] (2) Gordon brought up racial topics and demanded Parker pick a side;[79] (3) Gordon told Parker that he talked "like a white guy" and that another employee acted "blacker"; (4) Gordon singled out Parker when he told an offensive joke about how a wig is "the best thing man ever made for a black woman"; (5) after the joke, when Parker asked Gordon if he had ever been with a black woman, Gordon said "No, Parker.  I'm from the

---

[77] Buttonwood argues that "the 'only' evidence Plaintiff has produced of any racial animus on the part of Gordon or Buttonwood is his own self-serving testimony."  *See* Def.'s Br. at p. 7.  But that is neither here nor there.  "In a hostile work environment case, a plaintiff's deposition testimony is sufficient to show the existence of a material factual issue for trial."  *Lucas*, 2013 WL 2156007, at *16 (internal quotation marks and citation omitted).

[78] Although Buttonwood argued in its supplemental briefing that Parker did not experience any reduction in his hours, including weekend work, and provided pay records to that effect (*see* Doc. No. 19), at the summary judgment stage, we must take all the facts in the light most favorable to the plaintiff and Parker has testified that he received less weekend work.

[79] For example, Gordon brought up the McGregor and Mayweather boxing match and asked "who's the better fighter and things like that.  Black and white stuff."  Parker Tr. 79:4–25.

other side of the bridge.  We don't do that.  And I'd be shunned from my community if I was

ever with a black woman"; (6) Gordon showed pictures of Parker's wife to other employees and

remarked, "how did he get a girl like that"; (7) Gordon yelled at Parker on more than one

occasion; and (8) on September 28, Gordon screamed at Parker at close range and so intensely

that his spit flew into Parker's face.  Parker also testified that although Gordon yelled at others,

he never witnessed Gordon scream in other people's faces like Gordon did with him.[80]

Buttonwood argues that aside from the offensive wig joke and comment about a co-

worker being "blacker" than Parker, Gordon's conduct was objectively neutral and not connected

to Parker's race.[81]  Parker himself testified that some of Gordon's conduct was "not reflecting to

race" and that he "felt like [Gordon] was being a bully and racist at the same time."[82]  But, as the

*Scott* court explained, a reasonable jury may find that facially neutral conduct—such as bullying

conduct—was actually employed to harass a plaintiff based on his race.  Here, a reasonable jury

believing Parker's testimony could conclude that Gordon's facially neutral conduct—such as

screaming and spitting in Parker's face on September 28 or no longer giving Parker weekend

work—was done to harass Parker because of his race.  Viewing the entire record in the light

most favorable to Parker, as we must at this stage, we hold that Parker has shown a genuine

dispute of material fact as to whether Gordon intentionally discriminated against him because of

his race.

### ii.    *Severe or Pervasive*

To state a claim for hostile work environment, the harassment must be severe or

---

[80] Parker Tr. 113:22–114:2.

[81] *See* Oral Argument Tr. 7:4 −10:21, 12:9−13:30; Def.'s Br. at pp. 7−10.

[82] Parker Tr. at 97:12−20.

pervasive enough "'to alter the conditions of the victim's employment and create an abusive

working environment.'" *Syed*, 906 F. Supp. 2d at 356 (quoting *Harris v. Forklift Sys., Inc.*, 510

U.S. 17, 21 (1993)).  The severe or pervasive "evaluation of a hostile work environment claim is

particularly unsuited for summary judgment, because whether the harassment or discrimination

is sufficiently severe or pervasive to create an abusive work environment is 'quintessentially a

question of fact.'" *Id.* (citation omitted).

Courts routinely emphasize that although incidents may not be sufficiently severe or

pervasive when viewed piecemeal or in isolation, the same events viewed collectively may reach

the threshold for severity or pervasiveness.  *See, e.g.*, *Lucas*, 2013 WL 2156007, at *15–16

("Although none of the events taken in isolation could be deemed 'severe' or 'pervasive,' these

same events viewed in conjunction could be deemed to regularly create a threatening and

humiliating employment environment."); *Jovan v. Pilgrim's Pride Corp.*, Civil Action No. 1:05-

CV-2443, 2007 WL 9759070, at *4 (M.D. Pa. Feb. 27, 2007).

In *Jovan v. Pilgrim's Pride*, one of the plaintiffs provided evidence that the Human

Resources manager "repeatedly insulted his national origin" by bringing in pictures of

"'uncivilized poorly clothed and dirty tribal folk and sarcastically inquir[ing] if these were [the

plaintiff's] people,'" "ask[ing] if Sri Lanka had any terrorists and if it was close to Afghanistan

and Iraq," and "inquir[ing] as to why [the plaintiff] brought salads for lunch instead of 'your real

food'" and asking "'do you guys eat raw meat, or do you eat snails.'"  2007 WL 9759070, at *4.

The court denied the defendant's motion for summary judgment as to that plaintiff and found

that a genuine issue of material fact existed as to whether the conduct was sufficiently severe or

pervasive to constitute a hostile work environment.  *Id.*  In so ruling, the court emphasized the

short period of time in which the comments transpired and that the incidents should be viewed

17

collectively:  "Taken in isolation, these comments likely would not violate Title VII; however, they occurred within a relatively brief period—[the plaintiff] was terminated ten days after [the HR manager] began as the full-time HR Manager.  Considered in the light most favorable to [the plaintiff], [the HR manager's] conduct would support a finding of hostile work environment." *Id.*; *see also Tolani*, 158 F. Supp. 2d at 597 (holding the plaintiff raised a genuine issue of material fact as to the hostile work environment claim where the plaintiff testified that his supervisor "referred to Indians as stupid and made derogatory comments about the way Indian people worship and Indian women dress," and that his supervisor "follow[ed] him around, mov[ed] him into a smaller office, and increas[ed] his workload and job responsibilities").

Similar to the conduct in *Jovan*, here, viewed collectively and in the light most favorable to Parker, Gordon's conduct could support a finding of hostile work environment. Specifically, (1) Gordon no longer offered Parker weekend work after learning that he was biracial; (2) Gordon brought up racial topics and demanded Parker pick a side; (3) Gordon told Parker that he talked "like a white guy" and that another employee acted "blacker" than him; (4) Gordon singled Parker out when he directed an offensive joke at Parker about how a wig is "the best thing man ever made for a black woman"; (5) Gordon told Parker that Gordon would be "shunned from [his] community if [he] was ever with a black woman"; (6) Gordon showed pictures of Parker's wife to other employees and remarked, "how did he get a girl like that"; (7) Gordon yelled at Parker; (8) Gordon closely stood behind Parker on more than one occasion, startling him, and at times, would stare at Parker in what Parker perceived to be a look of disgust; and (9) on September 28, Gordon screamed at Parker and his spit flew into Parker's face, prompting Parker to feel so threatened that Parker felt he had no choice but to walk off the job site.  Parker also testified that he felt like he was constantly "walking on eggshells" working for

Gordon, and was worried that Gordon would scream at him more.[83]  All of this conduct occurred over a short period of time.

Parker also testified to at least two instances of overt discriminatory conduct (*i.e.*, the offensive joke incident in which Gordon also said he would never sleep with a black woman, and saying that another worker was "blacker"), in addition to instances of more facially neutral conduct (*e.g.*, no longer asking Parker to work on the weekends, yelling at Parker so intensely that spit flew in Parker's face).  As discussed above, a reasonable factfinder could find that facially neutral conduct was motivated by discriminatory intent, "thus inflating the overall frequency of the discriminatory conduct."  *See Syed*, 906 F. Supp. 2d at 356–57.  The Court finds that a reasonable trier of fact could conclude that the conduct is sufficiently severe and pervasive to support a finding of hostile work environment.  Accordingly, we find that Parker has shown there is a genuine issue of material fact as to whether the harassment was sufficiently severe or pervasive to create a hostile work environment.

environment.

### iii.    *Discrimination Detrimentally Affected Plaintiff*

Next, with respect to the subjective prong, Buttonwood contends that Parker cannot show that he was detrimentally affected by Gordon's comments.[84]  As discussed above, Parker testified that he felt like he was "walking on eggshells" going into work for Gordon.  In his email to Buttonwood's owner, Parker explained that he felt threatened by Gordon during the September 28 verbal altercation, and, as a result, he resigned that same day.  Parker also testified that in the immediate aftermath of the September 28 incident, he felt "humiliated" and "[tears]

---

[83] Parker Tr. 107:15−108:15, 110:17−111:7.

[84] Def.'s Br. at pp. 8–9.

were there," such that one of his co-workers put an arm around him to comfort him.[85]  We hold

that a reasonable juror could find that Gordon's conduct detrimentally affected Parker.

### iv.     *Discrimination Would Detrimentally Affect a Reasonable Person in Similar Circumstances*

Fourth, Buttonwood argues that Parker has not shown that Buttonwood created an

objectively hostile work environment.[86]  "'Conduct that is not severe or pervasive enough to

create an objectively hostile or abusive work environment—an environment that a reasonable

person would find hostile or abusive—is beyond Title VII's purview.'"  *Lucas*, 2013 WL

2156007, at *16 (quoting *Harris*, 510 U.S. at 21).

In *Syed v. YWCA of Hanover*, the court held that a factfinder could conclude that the

comments directed at the plaintiff's appearance or accent would detrimentally affect a reasonable

person of the same race or national origin as the plaintiff.  906 F. Supp. 2d at 357; *see also*

*Lucas*, 2013 WL 2156007, at *17 (holding that the plaintiff had established a genuine issue of

material fact as to the objective element).  Likewise, in this case a reasonable juror could find

that Gordon's overtly discriminatory comments (*i.e.*, that another employee was "blacker" and

the offensive joke), coupled with his other conduct (*e.g.*, screaming at close range and staring in

disgust), would detrimentally affect a person of the same race as Parker.

### v.     *Employer Liability*

Finally, Buttonwood does not dispute employer liability.[87]  Even if Buttonwood did

dispute employer liability, the Court finds that there is a basis for *respondeat superior* liability.

---

[85] Parker Tr. 140:22–141:19.

[86] Def.'s Br. at pp. 8–10.

[87] *See generally* Def.'s Br. at pp. 4–10; Def.'s Reply Br. (Doc. No. 13) at pp. 4–5.

It is undisputed that Gordon was Parker's supervisor with immediate authority over him, and thus Buttonwood could be vicariously liable for a hostile work environment created by Gordon. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 807–08 (1998); *see also Sistrun v. Time-Warner Cable*, No. Civ. A. 02-CV-8023, 2004 WL 1858042, at *7 (E.D. Pa. Aug. 19, 2004), *reconsideration granted in part on other grounds*, 2004 WL 2663243 (E.D. Pa. Nov. 21, 2004) (finding that the plaintiff had sufficiently demonstrated the existence of *respondeat superior* liability where the harassers were also her supervisors).

Reviewing the evidence in the light most favorable to Parker and resolving all reasonable inferences in his favor, the Court finds that he has presented sufficient evidence to raise a genuine issue of material fact.  Accordingly, Buttonwood's Motion for Summary Judgment on Parker's hostile work environment claim will be denied.

**B.**   **Claim for Race Discrimination based on Disparate Treatment, Resulting in Constructive Discharge**

Buttonwood argues that Parker has failed to put forth sufficient evidence to support his claim for disparate treatment on the basis of race.[88]  A disparate treatment violation occurs "when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII."  *Frazier v. Exide Tech.*, Civil Action No. 11-1863, 2016 WL 6600262, at *10 (E.D. Pa. Nov. 8, 2016) (internal quotation marks and citation omitted).  To prevail on a race discrimination claim under Title VII, in a case without direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies, and a plaintiff must first establish by a preponderance of the evidence a *prima facie* case of discrimination.  *Lucas*, 2013 WL 2156007,

---

[88] Def.'s Br. at pp. 10–16.

at *19 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Once the plaintiff

has established a *prima facie* case, the burden shifts to the defendant to articulate a "legitimate,

non-discriminatory reason" for the employment decision.  *Fenter v. Mondelez Global, LLC*, 574

F. App'x 213, 216 (3d Cir. 2014) (citations omitted).  If the defendant satisfies its "relatively

light burden," the burden "shifts back to the plaintiff to present evidence from which a

reasonable fact-finder could infer that the employer's proffered reasons are pretextual."  *Id.* at

216.

To state a *prima facie* case for discrimination, a plaintiff must show that (1) he is a

member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse

employment action, and (4) the action occurred under circumstances that could give rise to an

inference of intentional discrimination.  *Frazier*, 2016 WL 6600262, at *10(citing *Jones v. Sch.

Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 2014)).  If a plaintiff fails to establish a *prima

facie* case, a defendant is entitled to judgment as a matter of law.  Parker, who identifies as

biracial (African American and Caucasian), is a member of a protected class, and as a Union

journeyman, he was qualified for his position.

"An adverse or tangible employment action is a significant change in employment status,

such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits."  *Barnett v. N.J. Transit

Corp.*, 573 F. App'x 239, 244 (3d Cir. 2014) (internal quotation marks and citation omitted).  "A

constructive discharge constitutes an adverse employment action for purposes of Title VII."

*Ellingsworth v. Hartford Fire Ins. Co.*, 247 F. Supp. 3d 546, 556 (E.D. Pa. 2017) (citations

omitted).  Here, Parker claims that Buttonwood constructively discharged him, and that his

membership in a protected class was a motivating factor in Buttonwood's decision.[89]

Courts have repeatedly noted that "constructive discharge requires 'something more' than a mere hostile work environment." *Lucas*, 2013 WL 2156007, at *18; *see also Spencer v. Wal-Mart Stores*, 469 F.3d 311, 316 n.4 (3d Cir. 2006) ("A hostile work environment 'will not always support a finding of constructive discharge.' 'To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment.'" (citations omitted)). Therefore, even though Parker's hostile work environment claim survives summary judgment, it "does not compel the conclusion that the constructive discharge claim must likewise survive." *Lucas*, 2013 WL 2156007, at *18. "Indeed, courts have found that a plaintiff could survive summary judgment on a hostile work environment claim, but not create a genuine issue of material fact on a related constructive discharge claim." *Id.* (collecting cases).

An employee's resignation is presumed to be voluntary. *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3d Cir. 1999). To overcome the presumption and establish a constructive discharge, a plaintiff must show that "'the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996) (quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888 (3d Cir. 1984)). The test is an objective one— "an employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge." *Mandel*, 706 F.3d at 169. Consequently, a plaintiff cannot establish "intolerability" "'by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the

---

[89] Compl. ¶¶ 40, 42.

employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign.'" *Frazier*, 2016 WL 6600262, at \*10 (quoting *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998)). In determining whether an employee was constructively discharged, courts in the Third Circuit consider certain non-dispositive factors, including: "whether the employee was [1] threatened with discharge, [2] encouraged to resign, [3] demoted or subject to reduced pay or benefits, [4] involuntarily transferred to a less desirable position, [5] subject to altered job responsibilities, or [6] given unsatisfactory job evaluations." *Mandel*, 706 F.3d at 169 (citing *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010)). [90]

Viewing the entire record in the light most favorable to Parker, there is no indication that Buttonwood suggested or encouraged Parker to resign, demoted or reduced Parker's pay or benefits, involuntarily transferred Parker to a less desirable position, or gave Parker unsatisfactory performance evaluations. At most, the record reflects that Gordon indicated to Parker that he could be discharged if he did not follow directions,[91] Parker's job responsibilities may have been altered when he was no longer given weekend work,[92] and Gordon criticized Parker's work when Parker did not follow directions.[93]

---

[90] Nowhere in his response does Parker address these factors or argue that Buttonwood threatened him with discharge, encouraged him to resign, demoted him or reduced his benefits, involuntarily transferred him to a less desirable position, subjected him to altered job responsibilities, or gave him unsatisfactory job evaluations. *See* Pl.'s Opp. Br. at pp. 9–11.

[91] *See* Def.'s Mot. for Summ. J., Ex. J at 3 (noting that Gordon told him on September 28, 2017, "[I]f you don't do things the way that I tell you to do them you're gone you're out of here[.]").

[92] Parker Tr. 74:5–75:2.

[93] Parker testified that Gordon's yelling on September 28, 2017 "was more so you're not doing what I told you to do, so now you're going to hear it." *Id.* at 131:4–10.

It is undisputed that Parker walked off the Hanover job site on September 28, 2017.[94]  It is also undisputed that prior to resigning, Parker did not any raise concerns about either Gordon's bullying or Gordon's discriminatory conduct.[95]  Parker never complained about being given less weekend work nor did he request a transfer before he quit.  At most, the day *after* walking off the Hanover job site, Parker requested that Harry Gordon re-assign him to a different work site.[96]  In *Clowes v. Allegheny Valley Hospital*, the Third Circuit considered:

> [it] highly significant that [the plaintiff], prior to leaving her position with the hospital, never requested to be transferred to another position, never advised the hospital that she would feel compelled to leave if changes regarding the manner in which she was being supervised were not made, and did not even attempt to file a grievance until long after she had stopped working at the hospital.  As other courts of appeals have noted, *a reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option*.

991 F.2d 1159, 1161 (3d Cir. 1993) (emphasis added) (citations omitted); *see also Hite*, 301 F. Supp. 3d at 484 ("In fact, the Third Circuit has cited an employee's failure to request a new position and to file a grievance as grounds to deny a constructive discharge claim." (citation omitted)); *Tourtellotte v. Eli Lilly & Co.*, Civil Action No. 09-0774, 2013 WL 1628608, at *6 (E.D. Pa. Apr. 16, 2013) ("[T]he Third Circuit has also noted that 'in most situations, a prerequisite to a successful constructive discharge claim is that the plaintiff attempted to explore alternatives before electing to resign.'") (quoting *Connors*, 160 F.3d at 975)).  So too here. Although Parker filed a grievance shortly after leaving his position, it is undisputed that, before

---

[94] Def.'s Mot. for Summ. J., Ex. J at 3 ("I was recently an employee of yours up until yesterday.  There was an incident where I felt like I had no other alternative but to walk off of the hanover job[.]").

[95] Parker Tr. 120:3–18; Def.'s Mot. for Summ. J., Ex. D, Pl.'s Resp. to Interr. No. 4.

[96] Parker Tr. 147:14–149:13 (Parker states that he asked Harry Gordon, "are you going to send me somewhere else?"); *see also* Def.'s Mot. for Summ. J., Ex. D, Pl.'s Resp. to Interr. No. 4 (noting that Parker asked Harry Gordon "to place him on another crew").

choosing to walk off the job site, Parker did not lodge any sort of complaint, request a transfer, or advise anyone at Buttonwood that he would be compelled to resign if Gordon's conduct did not change.

When questioned about whether he had previously raised his concerns about Gordon's behavior to anyone at Buttonwood, Parker testified, "No, *because I didn't feel they were too serious*. They weren't hurting me as bad as when he spit in—when the spit was flying out of his mouth, that was a hurt piece."[97]  Parker also testified that Gordon's actions had a cumulative effect, which resulted in his decision to walk off the job site:

> [I]t was leading up to [my last day].  It was the black joke.  It was [the incident with the apprentice].  And the incident that shortened me on my tools.  And then it was the getting in my face and screaming at the top of your lungs.  And then it was okay, one, two, three, I'm out of here.  I can't deal with this, man . . . .[98]

Despite the cumulative effect of Gordon's conduct, the Court finds that a reasonable employee would not have felt compelled to resign on the spot, but rather would have sought out alternative avenues first.

Constructive discharge may also occur "'when the employer is aware that the employee has been subjected to a continuous pattern of harassment and the employer does nothing to stop it.'"  *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 168 (3d Cir. 2001) (quoting *Aman*, 85 F.3d at 1084–85).  Here, Parker has not produced any evidence suggesting that anyone at Buttonwood was aware of Gordon's discriminatory conduct before Parker walked off the job site.[99]  Rather, undisputed evidence in the record shows the opposite.  Parker admitted that he did not raise

---

[97] Parker Tr. 120:3–18 (emphasis added).

[98] *Id.* at 121:25–122:13.

[99] Nor does Parker argue that Buttonwood should have been aware of Gordon's discriminatory conduct before he complained on September 29, 2017.  *See* Pl.'s Opp. Br. at pp. 9–11.

concerns about Gordon's behavior until the day after the September 28 incident.  Further,

Buttonwood's President testified that neither she nor the project manager, were aware of any

allegations of discriminatory conduct on Gordon's part until receiving Parker's September 29,

2017 email.[100]

Parker has not satisfied his burden with respect to the third element of a *prima facie* case,

and thus there is no triable issue of fact with respect to whether Parker was constructively

discharged.[101]  Accordingly, we grant summary judgment to Buttonwood on Parker's claim for

race discrimination based on disparate treatment.

### C.     *Retaliation Claim*

During oral argument, Parker abandoned his retaliation claim.[102]  Thus, we grant

summary judgment on the retaliation claim.  The Court also finds that even if Parker had not

abandoned his claim, summary judgment would still be appropriate.[103]

---

[100] Tiedeken Tr. 12:13–13:3.

[101] Parker has not asserted any adverse employment actions, aside from the alleged constructive discharge, nor has the Court found evidence of any in the record.

[102] Oral Argument Tr. 15:5–17.

[103] Parker did not check the retaliation box on his EEOC Charge, nor did he allege any retaliatory conduct in the charge.  As a result, Parker failed to exhaust his administrative remedies as to his retaliation claim. *See Mandel*, 706 F.3d at 164 (holding that the plaintiff failed to exhaust administrative remedies for retaliation claims and affirming dismissal, where the plaintiff did not check the retaliation box on the charge and failed to allege any retaliatory conduct in the charge).

Parker also cannot state a *prima facie* case of retaliation under Title VII.  To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) his employer took adverse employment action against him after or contemporaneously with his protected activity; and (3) there was a causal connection between his protected activity and the adverse employment action. *Moore v. City of Phila.,* 461 F.3d 331, 340–41 (3d Cir. 2006) (citation omitted).  If the plaintiff succeeds in establishing a *prima facie* case of retaliation, the familiar *McDonnell Douglas* burden-shifting framework applies.  *Id.* at 342.

As noted above, the record does not support a finding of constructive discharge.  Because Parker cannot demonstrate that he experienced an adverse employment action, Parker fails to meet his burden of

**D.      Exhaustion of Administrative Remedies as to the PHRA Claim**

To bring suit under the PHRA, a plaintiff must file an administrative charge with the Pennsylvania Human Relations Commission ("PHRC") within 180 days of the alleged act of discrimination.  43 Pa. Stat. § 959(a), (h); *see also Mandel*, 706 F.3d at 164.

On November 17, 2017, Parker filed an EEOC Charge of Discrimination, which he requested be dual-filed with the PHRC.[104] At oral argument, Buttonwood conceded that Parker's charge was filed with the PHRC but contends that because Parker did not receive a right to sue letter from the PHRC, Parker's claims are precluded under the PHRA, 43 Pa. Stat. § 962(c)(1)–(2).[105]  Buttonwood is mistaken.  Both Pennsylvania and Third Circuit precedent make clear that receiving a right to sue letter is not a prerequisite for bringing suit under the PHRA.  *See, e.g.*, *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 471 (3d Cir. 2001) ("Importantly, and unlike under Title VII, *notice of the right to sue is not required in order to bring the PHRA action.  Instead, after one year has elapsed, a complainant may bring a court action regardless of whether or not he has received a letter from the PHRC*." (emphasis added) (citations omitted)); *Wardlaw v. City of Phila.*, Civil No. 09-3981, 2011 WL 1044936, at *3 (E.D. Pa. Mar. 21, 2011) (same); *Tlush v. Mfrs. Res. Ctr.*, 315 F. Supp. 2d 650, 656 (E.D. Pa. 2002) (same); *Snyder v. Pa. Ass'n of Sch. Retirees*, 566 A.2d 1235, 1240 (Pa. Super. Ct. 1989) ("We garner . . . support for the proposition that where a complainant has not had his/her grievance resolved by the

---

establishing a *prima facie* case of retaliation.

[104] Supp. Ex. A.

[105] Oral Argument Tr. 4:1–6:22.  43 Pa. Stat. § 962(c)(1) provides: "If within one (1) year after the filing of a complaint with the Commission, the Commission dismisses the complaint or has not entered into a conciliation agreement to which the complainant is a party, the Commission must so notify the complainant.  On receipt of such a notice the complainant shall be able to bring an action in the courts of common pleas of the Commonwealth based on the right to freedom from discrimination granted by this act."

PHRC within one year of the filing of the same, then the PHRA authorized the grievant to pursue another avenue of recourse; more particularly, the judicial system and this is so even though no 'notice' of discontinuance/dismissal is forwarded to the complainant by the PHRC.").

Because Parker dual-filed his EEOC charge with the PHRC, and did not bring his PHRA claim until February 21, 2019 (more than one year after filing his charge), we find that Parker exhausted his administrative remedies.

The same legal standards apply to Title VII and PHRA claims, so we considered Parker's Title VII and PHRA discrimination, retaliation, and hostile work environment claims together in our analysis above.  *See, e.g.*, *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 464 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims." (citing *Kelly v. Drexel Univ.*, 94 F. 3d 102, 105 (3d Cir. 1996))); *Hite*, 301 F. Supp. 3d at 482 ("Although Plaintiff's claims arise under both federal and state law, they are appropriately analyzed together because 'the standards are the same for purposes of determining the summary judgment motion' in race discrimination cases." (citations omitted)).

*IV.*   ***Conclusion***

Parker has raised genuine issues of material fact as to his hostile work environment claim.  However, Parker has failed to make out a *prima facie* case of race discrimination based on disparate treatment, and he abandoned his retaliation claim.  Therefore, we shall grant Buttonwood's Motion for Summary Judgment as to Parker's race discrimination and retaliation claims and deny the Motion as to Parker's hostile work environment claim.

An appropriate order follows.